# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN MCARDLE,

                Plaintiff,

      v.

DISTRICT OF COLUMBIA,

                Defendant.

Case No. 19-cv-3637 (JMC)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff John McArdle sued the District of Columbia for national origin and age discrimination under Title VII of the Civil Rights Act of 1964 (Title VII) and the Age Discrimination in Employment Act (ADEA) by his employer, the Metropolitan Police Department (MPD).[1] The District moved for summary judgment, and McArdle opposed. For the following reasons, the Court **DENIES** the District's motion as to McArdle's ADEA hostile work environment claim but **GRANTS** the District summary judgment as to all other claims.

## I.    BACKGROUND

Unless otherwise stated, the following facts are undisputed. McArdle, who is over the age of forty, began working as a police officer for MPD in 1990. ECF 34 at 2 ¶ 1; ECF 30 at 3 ¶ 1; ECF 34-4 at 8. While at MPD, he worked with the Special Operation Division (SOD) as a motorcycle trainer. ECF 34 at 2 ¶ 2; ECF 30-1 at 8. In June 2006, McArdle voluntarily resigned

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

from MPD to move to Canada. ECF 34 at 2 ¶ 3; ECF 30 at 3 ¶ 2. At the time that he resigned, McArdle made $65,407 per year. ECF 36-1 at 2 ¶ 3. From 2007 to 2013, McArdle worked for a Canadian police department and eventually obtained Canadian citizenship.[2] ECF 34 at 2 ¶ 3; ECF 30 at 3 ¶ 4.

In 2013, McArdle returned to the United States and reapplied to MPD. ECF 34 at 2 ¶ 4; ECF 30 at 3 ¶ 5. In June 2014, MPD hired McArdle as an entry-level officer earning $50,664 per year. *See* ECF 36-1 at 4 ¶ 6; ECF 34-5 (MPD Offer Letter). The parties dispute both whether McArdle was eligible to be reinstated at his prior rank and salary, and whether McArdle ever requested such reinstatement. *See* ECF 30 at 3–4 ¶¶ 6–7; ECF 34 at 18–21.

According to McArdle, several MPD members informed him that he would soon be transferred back to SOD and receive his former pay—the higher salary he earned before he resigned. ECF 34 at 3 ¶ 7. McArdle testified, for example, that an officer told him that MPD would send him "right back to the SOD like they do everyone else." *Id.* He further claims that HR representative Antoine Payne promised him that he would be "taken care of" and "get his full pay back." *Id.* at 3–4 ¶¶ 7–10. By August 2014, however, McArdle claims that Matthew Miranda, another HR representative, called him and apologized for making a "mistake." *Id.* at 4 ¶ 11. Miranda advised that since McArdle was rehired but not reinstated, he would start at the bottom of the pay scale. *Id.* McArdle testified that Miranda also told him that he "would probably not make it through training and would only get injured because he was 'old.'" ECF 34 at 4 ¶ 13.

McArdle then began training at the Police Academy on August 28, 2014, where he alleges that he was subjected to regular insults and taunts about his age. *Id.* at 5 ¶ 14; ECF 30 at 4 ¶ 10; *see generally* ECF 34 at 8–9. Two officers who attended the Academy with McArdle testified that

---

[2] McArdle now holds dual citizenship with the United States and Canada. *See* ECF 36-1 at 2 ¶ 1.

officers constantly referred to him as "old" and "old man" throughout the eight-month training. ECF 34 at 5 ¶ 14. According to one of these officers, McArdle was the oldest recruit in their class and was subjected to the "old man" comments "at least every other day" as a form of "hazing." *Id.* She added that these comments "could come off as malicious." *Id.* This name calling continued after McArdle graduated from the academy in April 2015 and began working in MPD's Fifth District. *See id.* at 5 ¶ 16; ECF 30 at 4 ¶ 11. There, McArdle faced additional derogatory comments about his age from fellow officers and one of his supervisors. For example, McArdle points to an instance where another officer announced on a radio bulletin that he was looking for "an older officer, someone that operates a motorcycle, who is Canadian and speaks with an accent," which McArdle understood to target him. ECF 34 at 6 ¶ 18. McArdle also testified that his supervisor, Officer Joseph Stimmel, frequently called him "old" and taunted him about his Canadian citizenship, and that Officer Craig Boyd called him "old" "almost every morning." *Id.* at 6 ¶¶ 19, 21. McArdle reported the comments to a supervising lieutenant, who then warned staff to no longer "make jokes about Canadians," but did not address the age-related comments. ECF 34 at 5 ¶ 17. According to McArdle, the comments persist "to this day." *Id.* at 6 ¶ 21.

McArdle still wanted to leave the Fifth District and return to SOD as a motorcycle officer. In July 2015, MPD posted a vacancy announcement for eight SOD motorcycle officer positions. ECF 30-6 at 2. McArdle applied that same month, but MPD withdrew the vacancy announcement in February 2016. ECF 30 at 4 ¶¶ 11–12; ECF 30-5; ECF 30-8.  In March 2016, MPD again posted a vacancy announcement for eight SOD motorcycle officer positions. ECF 30-7 at 2. McArdle applied, but MPD withdrew the vacancy in April 2016. ECF 30 at 4 ¶¶ 11–12; ECF 30-9. Although a third vacancy announcement was posted in November 2018, ECF 30-10 at 2, McArdle did not apply, ECF 30-1 at 65–66. McArdle testified that he believes Robert Glover, a supervisor in SOD,

"had something to do with" the withdrawal of the vacancies. *See* ECF 30-1 at 68; ECF 34 at 4 ¶ 12. McArdle claims that he called Glover in 2016 to discuss transferring into the SOD, and that Glover laughed and told him: "[y]ou're a Canadian. You don't understand," and "things have changed, you're older now, what's a Canadian have to offer?" ECF 34 at 4 ¶ 12. McArdle traces Glover's alleged animosity to the fact that McArdle once failed Glover in a motorcycle training course during his first stint at MPD. ECF 30-1 at 68–69.

On July 11, 2016, McArdle filed a Charge of Discrimination with the EEOC. ECF 34 at 6 ¶ 22; ECF 30 at 6 ¶ 27. McArdle claimed that he was "called 'old man' by the Commanders and by the other officers" on "a daily basis" and that MPD "refuse[d] to hire [McArdle] at [his] level of experience because of [his] age and [his] national origin." ECF 30-12 at 3 (EEOC Charge). McArdle then filed suit here, ECF 1, and subsequently amended his complaint, ECF 15. He alleges discrimination on the basis of national origin in violation of Title VII and discrimination on the basis of age in violation of the ADEA. ECF 15. Following discovery, the District of Columbia moved for summary judgment, ECF 30, McArdle opposed, ECF 34, and the District replied, ECF 36. McArdle moved to file a surreply, ECF 37, which the District opposed, ECF 39. The Court granted McArdle's motion for leave to file a surreply, and has considered both that motion and the District's arguments in opposition to it in rendering this decision. *See* Mar. 31, 2025 Min. Order.

## II.     LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a

motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). To do so, the nonmoving party must demonstrate that "there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Talavera*, 638 F.3d at 308. The nonmoving party must produce more than a "scintilla of evidence" in support of its positions, *id.*, and its evidence must consist of more than unsupported allegations or denials. *See Celotex*, 477 U.S. at 321 & n.3. If the evidence cited by the nonmoving party is "merely colorable" or "not significantly probative," summary judgment may be granted in favor of the moving party. *Anderson*, 477 U.S. at 249–50.

In making their arguments for or against summary judgment, both parties are responsible for pointing the Court to specific evidence in the record that supports their positions. Fed. R. Civ. P. 56(c)(1)(A); *see also Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009). "[E]vidence laying dormant in the record is not enough." *Potter*, 558 F.3d at 550. "[T]he district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis . . . of what may, or may not, be a genuine issue of material disputed fact." *Id*.

### III.    ANALYSIS

McArdle argues that MPD discriminated against him by failing to reinstate him at his previous paygrade, denying him a transfer to SOD, and subjecting him to a hostile work environment, all because of his national origin (in violation of Title VII) and age (in violation of the ADEA). Title VII prohibits employers from discriminating "against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA prohibits employers from discriminating "against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's age," provided the victim of such discrimination is at least forty years old. 29 U.S.C. §§ 623(a)(1), 631(a).  The Court concludes that McArdle's claims related to his rehiring are time-barred and that no reasonable jury could conclude that McArdle was not transferred to SOD because of any protected characteristic. With regard to McArdle's hostile work environment claims, the Court finds that the District is entitled to summary judgment under Title VII, but not under the ADEA. The Court explains the bases for its decision below.

### A.  Failure to Reinstate

McArdle claims that MPD refused to reinstate him at his previous paygrade because of his national origin and age in violation of Title VII and the ADEA. The District moves for summary judgment on these claims, arguing that they are time-barred.  ECF 30 at 14–16.

Under both Title VII and the ADEA, a charge of discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice. *See Dyson v. District of Columbia*, 808 F. Supp. 2d 84, 87 (D.D.C. 2011); *Congress v. District of Columbia*, 277 F. Supp. 3d 82, 87 (D.D.C. 2017). A discrete act of discrimination occurs on the day that act takes place.

*See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002). Viewing the evidence in the light most favorable to McArdle, he knew that he would not be reinstated at his former salary (at the very latest) in August 2014, when Miranda told McArdle that because he had been rehired but not reinstated, he would start at the bottom of the pay scale. *See* ECF 34 at 4 ¶ 11. McArdle filed his EEOC complaint nearly two years later, on July 11, 2016, which is well outside the 300-day window. *See* ECF 34 at 6 ¶ 22; ECF 30 at 6 ¶ 27.

McArdle's arguments otherwise are not persuasive. First, McArdle insists that his claims are timely because they are based on "continuing violations." ECF 34 at 11. The Court takes up that argument as to McArdle's hostile work environment claims below, *see infra* Part III.C.2.ii, but a discriminatory (re)hiring claim is an allegation of a discrete, not continuing, violation. *See Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."). Second, McArdle contends that his 300-day window did not begin until after he graduated from the Academy in April 2015 and developed "reasonable suspicion" that MPD had failed to reinstate him for a discriminatory reason and that its prior representations he would eventually be transferred were false. ECF 34 at 12–13 (quoting *Aceto v. England*, 328 F. Supp. 2d. 1, 7 (D.D.C. 2004)). But again, McArdle himself testified that, as early as August 2014, an MPD HR representative made derogatory statements about his age during a conversation with McArdle about his desire to be reinstated at his previous rank and pay. *See* ECF 34 at 4 ¶ 11. That undercuts any argument that McArdle was not on notice of any age discrimination claim related to MPD's decision not to reinstate him.

Because McArdle was told that he would not be reinstated at his former salary in August 2014, more than 300 days before he filed his EEOC complaint, discrimination claims based on

that incident are untimely. Accordingly, the Court grants summary judgment to the District on all claims related to MPD's 2014 decision not to reinstate McArdle at his former salary.

### B.  Denial of Transfer

The District moves for summary judgment on McArdle's claim that MPD refused to transfer him to SOD because of his national origin (in violation of Title VII) and age (in violation of the ADEA). Under both Title VII and the ADEA, a discrimination claim requires "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). A plaintiff can satisfy those elements by presenting direct or indirect evidence of discrimination. *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020). "Direct evidence—sufficient on its own to entitle a plaintiff to a jury trial—usually takes the form of a 'statement that itself shows . . . bias against a protected class in the employment decision.'" *Id.* (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013)). Indirect evidence of discrimination is just as probative as direct evidence, but is circumstantial. The plaintiff may not be able to point to an actor's admission that he took the challenged action because of a plaintiff's national origin or age, but the circumstances surrounding the action nonetheless indicate that discrimination occurred. *See Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 146–47 (D.D.C. 2016) (explaining that indirect evidence "does not require an expression of bias on the face [of] the statement," and that "[d]iscrimination must instead be inferred from the statement based on what was said and the surrounding circumstances").

Cases involving circumstantial or indirect evidence of discrimination are evaluated using the familiar three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999). A plaintiff must

first establish a prima facie case of discrimination by showing that "(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). The burden then shifts to the employer to present a legitimate, nondiscriminatory justification for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802

The District moves for summary judgment on McArdle's claim that MPD discriminated against him by refusing to transfer him to SOD. The District argues that McArdle has failed to make out even a prima facie case because he was "*not* denied a transfer to SOD"—rather, the vacancies he applied to were withdrawn and no one was hired to fill those positions. *Id.*; ECF 30 at 23; *see* ECF 30-8 at 2; ECF 30-9 at 2. In response, McArdle argues that he has amassed both direct and circumstantial evidence of discrimination that should be considered by a jury at trial. The Court addresses each, and concludes that, even viewing the evidence in the light most favorable to McArdle and resolving all material factual disputes in his favor, the District is entitled to judgment as a matter of law.

### i.    *Direct evidence of discrimination*

McArdle argues that Robert Glover, an SOD supervisor, made disparaging comments to him about his age and national origin, and that those statements are direct evidence of discriminatory intent that should preclude summary judgment. *See* ECF 34 at 14. The District argues that it is still entitled to judgment as a matter of law because undisputed record evidence establishes that Glover played no role in any personnel actions related to the SOD position. ECF 36 at 6. The Court agrees with the District.

McArdle testified that he called Glover in 2016 to discuss transferring into SOD, and that Glover laughed and told him: "[y]ou're a Canadian. You don't understand," and "things have changed, you're older now, what's a Canadian have to offer?" ECF 34 at 4 ¶ 12. These statements are facially discriminatory and wholly inappropriate. But those statements are only material to McArdle's case if the record establishes some connection between Glover and McArdle's transfer application. *See Oviedo*, 948 F.3d at 395 (no direct discrimination where offensive statements were not made by "the decisionmaker" in the adverse employment action); *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (suggesting that "a statement that itself shows racial or gender bias *in the [employment] decision*" would be direct evidence of discrimination (emphasis added)); *Wilson v. Cox*, 753 F.3d 244, 247–48 (D.C. Cir. 2014) (finding direct evidence where the supervisor "who made the decision to terminate [plaintiff]" made comments regarding older employees). Glover testified that he had no authority to rescind the vacancies. ECF 30-11 at 15–16. McArdle identifies no evidence to dispute this. (No witness who contradicted Glover's claim that he had no decision-making authority over the vacancy. No job description establishing that a supervisor like Glover would have exercised such control, or even influence, over a personnel action. Nothing.) To the contrary, McArdle *admitted* he has no evidence that Glover had anything to do with the decision to rescind the SOD openings. ECF 30-1 at 68.

When it comes to direct evidence, the question is not whether any employee—even one in a supervisory position—has ever made a discriminatory statement. The question is whether discrimination played a role in MPD's decision to rescind these vacancies. Because McArdle provides no evidence that would link Glover to MPD's decision to rescind the vacancies, and points to no other direct evidence of discrimination in the context of the SOD vacancy decision,

the Court cannot agree with McArdle that he has presented material, direct evidence of discrimination sufficient to withstand summary judgment.

### ii.    *Indirect evidence of discrimination*

In the absence of direct evidence, courts generally evaluate discrimination claims under Title VII and the ADEA using the burden-shifting framework articulated in *McDonnell Douglas Corp.*, 411 U.S. at 792. A plaintiff must first establish a prima facie case of discrimination by showing that "(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Forkkio*, 306 F.3d at 1130. The burden then shifts to the employer to present a legitimate, nondiscriminatory justification for the challenged action. *See McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer articulates a legitimate, nondiscriminatory reason for the challenged action, the *McDonnell Douglas* framework falls away. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). Instead, the court simply asks: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated against the employee?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

The District argues that McArdle has failed to establish a prima facie case because he was not subject to any adverse employment action. *See* ECF 36 at 7. Per the District, McArdle was "*not* denied a transfer to SOD"—rather, the vacancies he applied to were withdrawn and no one was hired to fill those positions. *Id.*; ECF 30 at 23; *see* ECF 30-8 at 2; ECF 30-9 at 2. It is true that if a plaintiff applies for a job opportunity that does not exist and is thus denied, there is no adverse action. But that is not exactly what happened here. McArdle applied for a vacancy that—at the

time of his application—did exist. *See* ECF 30 at 4 ¶ 12 ("The vacancy announcements that Plaintiff applied for in July 2015 and March 2016 were withdrawn on February 12, 2016 and April 27, 2016 respectively."); ECF 30-5 at 2; ECF 30-6 at 2–4; ECF 30-7 at 2–4; ECF 30-8 at 2; ECF 30-9 at 2. Because of his employer's conduct—MPD's decision to withdraw the vacancies— McArdle did not receive the transfer he applied for. That could, in some circumstances, constitute an adverse action. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354–355 (2024) (holding that an adverse employment action requires only "some harm respecting an identifiable term or condition of employment"); *In Suk Kim v. Vilsack*, No. 10-cv-2101, 2011 WL 445639, at *2 (N.D. Cal. Feb. 3, 2011) (holding that plaintiff had made out a prima facie case where she "allege[d] that Defendant 'cancelled' the announcement for the position for which she applied," which "could be understood to allege that the job announcement was withdrawn, not for legitimate business reasons, but based on unlawful discrimination against Plaintiff"); *see also Chappell-Johnson v. Powell*, 440 F.3d 484, 487–88 (D.C. Cir. 2006) (holding that plaintiff stated a prima facie case by alleging that she was not given a fair opportunity to compete for a vacant position, even though the vacancy was never filled). Imagine a case in which only women apply for a vacant position. The employer only wants to hire men and decides to withdraw the vacancy rather than hire a woman. Would that be an "adverse action" within the meaning of Title VII? Of course. The Court therefore disagrees with the District that the mere fact that MPD withdrew the vacancies McArdle applied for necessarily means that he was not subject to an adverse action.

But McArdle still faces a problem: he has not created a genuine dispute of material fact as to whether MPD failed to transfer him to SOD because of any protected characteristic. There are two ways to think about that problem. First, to make out a prima facie case, McArdle must put forward evidence to suggest that "the unfavorable action gives rise to an inference of

discrimination." *Forkkio*, 306 F.3d at 1130. Second, the Court could construe the District's argument that McArdle was not transferred solely because MPD withdrew the vacancy as a legitimate, nondiscriminatory reason for the adverse action. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (recognizing that "[a]lthough the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant," one of which is "the absence of a vacancy in the job sought"). Once the District proffers that rationale, the prima facie case falls away and the burden shifts to McArdle to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated against [him]." *Brady*, 520 F.3d at 494; *see Figueroa*, 923 F.3d at 1086–87. Either way, the outcome is the same.[3] As the Court explains below, McArdle has not identified any evidence to support "an inference of discrimination," *Forkkio*, 306 F.3d at 1130, or to allow a reasonable jury to find that the District's stated reason for not transferring him was mere pretext for discrimination, *see Brady*, 520 F.3d at 494.

McArdle argues that "the constant references to Officer McArdle being 'old' and an 'old man,' combined with multiple warnings from management that he may not make it through Police Academy training because of his age, could lead a reasonable jury to infer bias." ECF 34 at 17–18. "[W]hen decision makers express . . . discriminatory feelings around the relevant time in regard to the adverse employment action complained of, 'then it may be possible to infer that the

---

[3] And because the outcome is the same, construing the vacancy recission as a legitimate, nondiscriminatory reason for the adverse action creates no prejudice to McArdle. Further, McArdle does not even address Defendant's argument that he failed to make out a prima facie case with respect to the transfer decision. *See* ECF 34 at 18–21. He does not make any argument, or offer evidence, to rebut Defendant's claim that he was not transferred because the vacancies were rescinded.

decision makers were influenced by those feelings in making their decisions.'" *Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001) (quoting *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000)). But, again, McArdle points to no evidence that any of the colleagues who made these comments played a decision-making role when it came to the vacancies. *See* ECF 34 at 17–18; *id.* at 2–6 (responding to Defendants' statement of material facts and including no information on this issue). As the Court has already explained above in considering whether McArdle has proffered direct evidence of discrimination, these general, derogatory statements do not suggest that MPD rescinded the vacancies for any discriminatory reason because McArdle identifies no record evidence that any declarant had any control or influence in any decision about those vacancies. Nor does McArdle point to any other evidence to suggest that MPD withdrew the vacancies for any discriminatory reason, or in order to prevent him from transferring to SOD.[4]

Because McArdle has identified no competent record evidence to suggest that MPD rescinded the vacancies for a discriminatory reason, he has failed to identify any material factual disputes for a jury to consider at trial. As such, the Court grants summary judgment for the District on McArdle's claim that MPD discriminated against him by preventing him from transferring to SOD.

## C. Hostile Work Environment

That leaves McArdle's hostile work environment claims. McArdle argues that the District subjected him to a "hostile work environment based on age and national origin." ECF 34 at 7. As

---

[4] That is not to say that a future employment discrimination plaintiff could not make such a claim. If, for example, McArdle had pointed to evidence that individuals who were not in his protected class were allowed to transfer to SOD, that the repeated posting and withdrawal of vacancies was unusual, or that decision-makers with authority to rescind these vacancies offered inconsistent justifications for doing so, he might well have had a case. But McArdle has done none of that. It appears that he has rested his entire argument concerning the SOD transfer on discriminatory statements, with no evidence that those statements were made by anyone responsible for making the decision to rescind the vacancies at issue. The Court cannot send a case to trial where the plaintiff has no evidence to present to a jury that goes to causation—a crucial element of a prima facie discrimination claim.

to national origin, the District contends that the conduct here does not rise to the level of a hostile work environment.[5] ECF 30 at 21–22. As to age, the District argues that McArdle did not properly assert a hostile work environment claim on the basis of age in his complaint and, even if he did, the claim fails. ECF 36 at 2–5. The Court finds that McArdle's complaint sufficiently alleges a hostile work environment claim, which was clearly the subject of discovery. While the record evidence does not support a claim for hostile work environment based on national origin, there are factual disputes that prevent the Court from grating summary judgment on McArdle's hostile work environment claim under the ADEA. The Court will permit that claim to proceed to trial.

### 1.  *McArdle sufficiently asserted an ADEA hostile work environment claim in his complaint*

The District argues that McArdle failed to allege a hostile work environment claim on the basis of age in his complaint. *See id.* at 2. It is true that McArdle's complaint does not use the exact phrase "hostile work environment" or refer to alleged harassment in the ADEA cause-of-action section of his complaint. *See* ECF 15 ¶¶ 51–55. But, under binding Circuit precedent, no magic words are required to allege a hostile work environment claim. *See Steele v. Schafer*, 535 F.3d 689, 694 (D.C. Cir. 2008) (holding that plaintiff who did not plead a standalone hostile work environment claim sufficiently made such a claim where she alleged discrimination and constructive discharge and requested reassignment to "a less hostile working environment"). As in *Steele*, McArdle's complaint "alleges 'discrimination,' which in principle includes a hostile work environment theory." *Id.*; *see* ECF 15 at 7. And McArdle emphasized, in both his EEOC complaint and his complaint before this Court, that "on a daily basis," he was subjected to "harassment, being called 'old man' by the Commanders and by other police officers." ECF 15

---

[5] The District notes that "[t]he basis of Plaintiff's national origin discrimination claim is unclear" and that "he *might* be pursuing a hostile work environment claim," before explaining why the District believes such a claim fails. ECF 30 at 21. Because the Court ultimately agrees with the District that the claim fails, the Court assumes that McArdle did adequately allege a national origin hostile work environment claim in his complaint.

¶ 38; *see* ECF 30-12 at 2. Those allegations are "sufficient to put defendants on notice" of McArdle's "theory of recovery": that he was subjected to a hostile work environment because of his age. *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1297 (D.C. Cir. 2010); *see Steele*, 535 F.3d at 694 (requesting a transfer "to a less hostile working environment" put defendants on notice that plaintiff was alleging a hostile work environment claim, despite the lack of a standalone hostile work environment claim in her complaint).

The Court agrees with the District that McArdle's complaint is not a model of clarity, but concludes that there is no prejudice to the District in allowing McArdle's ADEA hostile work environment claim to go forward. *Compare Steele*, 535 F.3d at 694 (allowing hostile work environment claim to go forward given the "absence of any apparent prejudice" to the defendant), *with Reshard v. LaHood*, 443 F. App'x 568, 570 (D.C. Cir. 2011) (holding that hostile work environment claim could not proceed, even though plaintiff's allegations "arguably might have sufficed to place [the defendant] on notice of a hostile work environment claim," because the plaintiff sought to "assert [hostile work environment] on reconsideration eight years later when evidence was stale and memories vague," which would "greatly prejudice [the defendant]—not to mention the fact-finder"). The District has known since the day McArdle filed his EEOC complaint that the repeated taunts about his age were at the center of McArdle's age discrimination claim. *See* ECF 30-12 at 2. The harassment about McArdle's age was also the subject of discovery. The District asked McArdle about it several times during his deposition, and three other witnesses testified to it. *See* ECF 34 at 5 ¶¶ 14–16; *see, e.g.*, ECF 30-1 at 30–31 (counsel for the defense stating, "[s]o, I understand being called old man repeatedly, that's one [part of your age discrimination claim]"); *id.* at 32 ("Q: [I]s there any other incident you can think of that's part of your age discrimination claim? A: Just continually being called old man, it's wrong."); *id.* at 72

(counsel for the defense, reviewing McArdle's response to an interrogatory that requested he describe "the instance in which an MPD employee has called you an old man"). Finally, the District had the opportunity to brief the ADEA hostile work environment issue and did so. *See* ECF 36 at 2–5; *cf. Reshard*, 443 F. App'x at 570 (holding that raising hostile work environment claim on motion for reconsideration would prejudice the defendant because that claim was not "investigated and litigated along with all of the other claims before the district court issued its . . . summary judgment order").

Given that McArdle alleged he was harassed about his age in his complaint and the District had the opportunity to take discovery on that claim and defend against it in its briefing before this Court, the Court concludes that the District is not surprised or prejudiced by McArdle's age-based hostile work environment claim. Accordingly, the Court concludes that McArdle has sufficiently raised a hostile work environment claim under the ADEA.

### 2. Summary judgment is appropriate as to McArdle's Title VII hostile work environment claim, but not his ADEA hostile work environment claim

The Court now turns to the merits of McArdle's Title VII and ADEA hostile work environment claims. Title VII prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, a plaintiff must show that he "was subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). That requirement includes both a subjective and objective element. Even if an employee subjectively views his environment as abusive, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or

abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Neither the "ordinary tribulations of the workplace" nor "petty insults, vindictive behavior, and angry recriminations" are sufficient. *Brooks*, 748 F.3d at 1277–78. In assessing hostile work environment claims, the Court must look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007). Because subjecting an employee to a hostile work environment is an ongoing violation, the Court may consider incidents that would not be timely if alleged as standalone acts of discrimination, so long as they are part of the same pattern of discrimination as at least one incident that falls within the statutory time period. *See Morgan*, 536 U.S. at 116–17. Courts apply the same Title VII standard to ADEA hostile work environment claims.[6] *See, e.g.*, *Moore v. Castro*, 192 F. Supp. 3d 18, 47 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson*, 775 F. App'x 2 (D.C. Cir. 2019); *Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 227 (D.D.C. 2015); *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 82 (D.D.C. 2015).

---

[6] The District remarks in passing that "this Circuit has not yet recognized a hostile work environment cause of action under the ADEA." ECF 36 at 2. The D.C. Circuit arguably assumed that such claims were cognizable in *Baloch*. 550 F.3d at 1201 ("[N]one of the comments or actions directed at Baloch expressly focused on his race, religion, *age*, or disability—unlike in some hostile work environment cases." (emphasis added)). Regardless, it sems that every other Circuit has either held or assumed that hostile work environment claims are cognizable under the ADEA. *See Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 25 (1st Cir. 2001); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 48 (2d Cir. 2019); *Hildebrand v. Allegheny Cnty.*, 923 F.3d 128, 137 (3d Cir. 2019); *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440–41 (5th Cir. 2011); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996); *Hambrick v. Kijakazi*, 79 F.4th 835, 842–43 (7th Cir. 2023); *Rickard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 184–85 (8th Cir. 2014); *Edwards-Yu v. DeJoy*, No. 22-36009, 2023 WL 8797506, at *1 (9th Cir. Dec. 20, 2023); *Carter v. Newman Mem'l Cnty. Hosp.*, 49 F. App'x 243, 244-45 (10th Cir. 2002); *Harvey v. Walmart, Inc.*, No. 23-11213, 2024 WL 1460314, at *2–3 (11th Cir. Apr. 4, 2024) (per curiam); *see also Moore v. Castro*, 192 F. Supp. 3d 18, 47–48 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson*, 775 F. App'x 2 (D.C. Cir. 2019) (allowing ADEA hostile work environment claim to go forward). The District makes no attempt to argue that all eleven of our sister circuits are wrong.

### i. *Hostile work environment based on national origin*

The District moves for summary judgment on McArdle's national origin hostile work environment claim, arguing that the harassment McArdle testified he experienced was neither severe nor pervasive. *See* ECF 30 at 22. In response, McArdle identifies just three examples of comments about his Canadian citizenship to support his hostile work environment claim: (1) the 2016 phone call with Officer Glover when he purportedly asked "what's a Canadian have to offer?"; (2) the November 2017 radio bulletin in which a detective stated that he was looking for an officer who "is Canadian and speaks with an accent"; and (3) the fact that Officer Stimmel, McArdle's former supervisor, "taunted him about his Canadian citizenship." ECF 34 ¶¶ 12, 18, 19.

These isolated incidents are not sufficient to allow McArdle to present his national origin discrimination claim to a jury. "The bar for demonstrating a hostile work environment is a high one." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016). McArdle must point to evidence from which a reasonable jury could find that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). These statements were certainly rude and inappropriate, but they were not "severe" as defined by the relevant caselaw. "[S]imple teasing" and "offhand comments" are generally not considered objectively "severe" conduct that gives rise to a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Take *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005). In that case, the D.C. Circuit upheld summary judgment for an employer on a hostile work environment claim where a Black woman was "told by three separate employees to 'go back to Trinidad' or to 'go back to where [she] came from,'" and "co-workers shouted at her, told her that she should never have been hired, and told

her to 'shut up.'" *Id.* at 408. If those statements were not "severe," it is hard to see how asking "what's a Canadian have to offer?," mentioning McArdle's accent, and teasing him about his Canadian citizenship could constitute a hostile work environment. *See also Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile work environment claim where plaintiff was told "he was easy to replace with an American, that [the employer] would not hire other Africans, and [he faced] criticism of his accent").

Nor does McCardle point to record evidence to establish that these comments were pervasive. A handful of comments over the course of three years by different individuals is not pervasive. *See, e.g.*, *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment."). Nothing in the record establishes the comments were any more frequent than cases where courts routinely find pervasiveness lacking. *See, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding lack of pervasiveness where "alleged events are temporally diffuse, spread out over a four-year period"); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (concluding that five discrete acts of discrimination in two years were insufficient to constitute a hostile work environment); *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) ("[S]poradic use of abusive language also is insufficient to establish a hostile work environment."). And although McArdle states that Stimmel "taunted" him about being Canadian, he points to no evidence establishing how frequently he was taunted (once? twice? every day?). ECF 34 at 6 ¶¶ 19–20. General testimony that someone was "taunted," absent any information about the content or frequency of those statements, is insufficient to send a hostile work environment claim to a jury.

McArdle's colleagues' statements may have been "tactless and ill-mannered," but the caselaw in this Circuit demands more. *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014). McArdle's evidence of allegedly hostile comments regarding his Canadian citizenship falls short of establishing a pattern of conduct that was sufficiently "severe or pervasive to alter the conditions of [his] employment." *Id.* at 1276. The Court therefore grants summary judgment to the District on this claim.

### ii. *Hostile work environment based on age*

Before addressing the merits of McArdle's ADEA hostile work environment claim, the Court will briefly address why this claim is timely. The District does not explicitly argue that this claim is time-barred. *See* ECF 36 at 2–5. However, the District does contend that "any claim based on" the allegation that McArdle was "called 'old man' by the Commanders and by the other officers" "[o]n a daily basis" is untimely, because McArdle was only subject to such harassment while he was at the Police Academy. ECF 30 at 15. McArdle graduated from the Academy in April 2015 and filed his EEOC complaint more than 300 days later in July 2016. *See id.* at 14–15. But, as the Court explains below, McArdle points to record evidence that this ageist harassment continued beyond his time at the Academy and throughout his tenure at MPD. *See* ECF 34 at 5 ¶¶ 15–21. Because a hostile work environment is an ongoing violation and at least some of the harassment occurred within the 300-day window, the Court also may consider the earlier harassment McArdle experienced at the Academy as part of his ADEA hostile work environment claim. *See Morgan*, 536 U.S. at 116–17.

Turning now to the merits. The District argues that McArdle cannot establish a hostile work environment on the basis of age. *See* ECF 36 at 2–5. McArdle disagrees, emphasizing that he was subjected to daily harassment about his age for several years. *See* ECF 34 at 8–9. The Court finds

that although these comments, in isolation, were not necessarily severe, McArdle has pointed to record evidence establishing that they were pervasive. A reasonable jury could therefore conclude that McArdle was subjected to a hostile work environment in violation of the ADEA.

While "[s]everity and pervasiveness are complementary factors and often go hand-in-hand, [a] hostile work environment claim could be satisfied with one or the other." *Brooks*, 748 F.3d at 1276; *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("The test set forth by the Supreme Court is whether the alleged conduct is 'sufficiently severe *or* pervasive'—written in the disjunctive—not whether the conduct is 'sufficiently severe *and* pervasive.'"). Although there is no "mathematically precise test" to determine when conduct becomes sufficiently pervasive, *Harris*, 510 U.S. at 22, courts have found that near daily name-calling can rise to the requisite level of pervasiveness to establish a hostile work environment claim, even if an isolated comment standing on its own would not be particularly severe. *See, e.g.*, *Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 94 (D.D.C. 2019) (denying summary judgment where conduct "occurred approximately two to three times a week from November 2015 to June 2016, and from February to June 2016, [] increased in frequency").

None of the comments that McArdle identifies as ageist are themselves "severe." *See George*, 407 F.3d at 408. But McArdle identifies record evidence establishing that he experienced these comments on a near daily basis for years. *See* ECF 34 at 8. The name-calling started almost immediately upon rejoining the police force. McArdle testified that before starting at the Academy in August 2014, a member of MPD's HR team told him that "he would probably not make it through training and would only get injured because he was 'old.'" ECF 34 at 4 ¶ 13. During his roughly eight months in the Academy, McArdle's fellow officers routinely called him "old" or "old man." *Id.* at 5 ¶ 14. These comments came from both rank-and-file officers and higher-ranking

police officers like sergeants and lieutenants. *See id.* And while McArdle's own testimony about this would be enough, independent witnesses—officers who attended the Academy with McArdle—corroborated his claims in discovery. One witness testified that she heard officers call McArdle an old man "at least every other day" as a "form of hazing," and described these comments as "malicious." *Id.* The harassment did not stop after training. McArdle testified that when he began working at MPD's Fifth District, his supervisor, Officer Stimmel, regularly called him "old." *Id.* at 6 ¶ 19. And Officer Craig Boyd, McArdle avers, called him "old" "almost every morning." *Id.* at 6 ¶ 21. McArdle reported the comments to a supervising lieutenant, who then warned staff to no longer "make jokes about Canadians" but did not address the age-related comments. *Id.* at 5 ¶ 17. According to McArdle, the comments about his age persist "[t]o this day." *Id.* at 6 ¶ 21.

Based on this evidence, the Court cannot agree with the District that these comments were too "generic and sporadic" to give rise to a claim. ECF 36 at 4. Although the comments were not themselves severe, being subjected to daily, discriminatory comments for years is undoubtedly pervasive. *See Thomas*, 412 F. Supp. 3d at 94 (finding a hostile work environment where comments occurred twice a week or more for roughly a year and a half); *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 99–100 (D.D.C. 2012) (holding that plaintiff's allegations that he was subjected to "pervasive, negative racial comments" that occurred "nearly every day for three years" were sufficient to state a hostile work environment claim); *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 10 (D.D.C. 2011) (holding that a "reasonable person could plausibly find" that "discriminatory conduct [that] occurred nearly every day for over four years" was "sufficiently pervasive"). Accordingly, McArdle has identified enough evidence for the Court to allow his hostile work environment claim based on age discrimination to go to a jury. *See Thomas*, 412 F.

Supp. 3d at 94 (denying summary judgment where "the pervasiveness of the conduct creates a genuine factual dispute for the jury as to whether plaintiff had to endure an abusive working environment").

*    *    *

Accordingly, the Court **DENIES** the District of Columbia's motion for summary judgment, ECF 30, with respect to McArdle's ADEA hostile work environment claim, but **GRANTS** the District's motion with respect to all other claims.

        **SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: April 22, 2025

24